John A. HAMILTON, Ann Davenport, Greg Hamilton, Marcia Schunemann, and Jane Hamilton, Appellants,

Virginia Haberstick, Plaintiff,

v.

MERCANTILE BANK OF CEDAR RAPIDS and Mercantile Investment and Trust Services, Appellees.

John A. Hamilton, Ann Davenport, Greg Hamilton, Marcia Schunemann, and Jane Hamilton, Plaintiffs,

Virginia Haberstick, Appellee,

State of Iowa ex rel. Civil Reparations Trust Fund, Appellee,

v.

Mercantile Bank of Cedar Rapids and Mercantile Investment and Trust Services, Appellants.

Nos. 99–0476, 99–0740.

Supreme Court of Iowa.

Jan. 18, 2001.

Roger T. Stetson and Margaret C. Callahan of Belin Lamson McCormick Zumbach Flynn, A Professional Corporation, Des Moines, and Gregory J. Epping and John D. Hedgecoth of Terpstra & Epping, Cedar Rapids, for Mercantile Bank, appellant in 99–0740 and appellee in 99–0476.

David J. Dutton and James F. Kalkhoff of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for Virginia Haberstick, appellee in 99–0740, and John A. Hamilton et al., appellants in 99–0476.

Thomas J. Miller, Attorney General, Craig Kelinson, Special Assistant Attorney General, and Richard E. Mull, Assistant Attorney General, for appellee State.

NEUMAN, Justice.

These appeals involve a trust department's blatant breach of its fiduciary duties to the beneficiary of a trust established under the will of Julie McDaniel Hamilton. The trustee, Mercantile Bank, concedes mismanagement but disputes the amount of damages awarded by the jury, both compensatory and punitive. Contin-

gent remaindermen, dismissed from the suit on summary judgment before trial, contest the court's ruling that they have no standing to bring an action for waste. Finding no error warranting reversal in either case, we affirm on both appeals.

## I. Background.

**A.** *Facts.* A jury could have found the following facts: A codicil to the will of Julie McDaniel Hamilton established a trust naming her sister, Virginia Haberstick, as the lifetime beneficiary. The only asset placed in trust was a real estate contract executed between Hamilton and Talman Hanson in 1982 for the sale of three multi-family dwellings in Cedar Rapids, Iowa. The three parcels of real estate, commonly known as 1574–76 Second Avenue S.E., 1578–80 Second Avenue S.E., and 115–117 16th Street S.E., contained seventeen apartment units and were sold for roughly $190,000. Hamilton's will directed the then–trustee, City National Bank of Cedar Rapids, to pay Haberstick, during her lifetime, "monthly, all of the net income of this trust, or $1,000.00, whichever is greater...." Upon Haberstick's death, the will directed the trustee to terminate the trust and distribute the balance of principal and accumulated income, including any balance owed on the contract, equally among Hamilton's eight children.

John Hamilton, a son and one of the remaindermen, testified that he had maintained the apartments for his mother during her lifetime and, at the time the trust was established, the properties were in "good shape." Hamilton died in 1985. Haberstick testified that she began receiving monthly checks from the trustee "almost immediately."

Sometime prior to 1989, Hanson—the original contract vendee—assigned his interest in the contract to Larry Johnson and Henry Knopf. In 1989, Johnson and Knopf assigned their interest to Patrick O'Welle for $113,000. O'Welle's interest in the property was eventually forfeited by City National Bank for nonpayment.

Thereafter the trustee executed an installment contract with Thomas Trosky to purchase all three rental properties for $110,000. Trosky's contract with the bank called for monthly payments of $1115.45, and obligated him to make timely payments of taxes and insurance. He was required to keep the property in good repair.

The record reveals that when the properties were sold on contract to Trosky in 1991, no one from City National Bank inspected them or inquired into Trosky's experience in real estate or his ability to fulfill the terms of the contract. Nor was there an inspection or appraisal of the properties when Hawkeye State Bank acquired the trust through a buy-out of City National's assets in March 1993. Mercantile Bank, which acquired Hawkeye State Bank in 1994, likewise made no effort to ascertain the condition of this trust asset or Trosky's financial status, despite the fact that due diligence in the corporate acquisition called for a comprehensive investigation of the actions of the predecessor trustee.

As it turns out, the properties on Second Avenue and 16th Street S.E. were deteriorating when Trosky purchased them and declined markedly during Trosky's tenure as the contract purchaser. City housing inspectors began issuing notices of intent to "placard" the dwellings for housing violations as early as 1990. The garage unit of 1574–76 Second Avenue was deemed unfit for human habitation in July 1991; the entire house was cited for violations in April 1993. The 16th Street location was cited for violations in August 1994, and again during a reinspection in March 1995. In May 1995, the property was placarded as uninhabitable due to problems ranging from missing windows to leaking ceilings, exposed wiring and peeling paint. A trust officer for Hawkeye State Bank, Rick Seger, evidently inquired about the notices it received in June 1993, but took no action to address them.

Trosky, meanwhile, also failed to keep the properties insured. A second notice of the lapse in commercial fire coverage was sent to Hawkeye State Bank in December 1993. No action was taken by the trustee to forfeit the contract or pay the premiums. Fire destroyed the units at 1578–80 Second Avenue in May 1994. Only then did the trustee's attorney (who formerly represented the trustor, Hamilton) learn that the property was not insured. No one from the bank contacted Haberstick to inform her that one of the apartment buildings had burned to the ground. In addition to the total property loss, the city assessed demolition costs of $15,921 jointly against Trosky and the bank.

Not surprisingly, Trosky made the contract payments only sporadically and failed to pay real estate taxes from 1989 through 1993. More surprisingly, the trustee did nothing about it. Tax certificates for the years 1990 through 1992 were sold at tax sale in September 1994. Despite being served with notices of these tax sales and expiration of the right to redeem, the trustee took no action to redeem the properties, or insist that Trosky do so. He was evidently able to redeem two of the properties. But a tax deed was issued to an entity named Linntaxcert for the property at 1574–76 Second Avenue. No one from the bank notified Haberstick that the property had been sold for unpaid taxes.

By 1995, with Mercantile Bank serving as successor trustee, all that remained as security for the real estate contract that formed the Hamilton trust was the house at 115–117 16th Street S.E. and the lot where the house known as 1578–80 Second Avenue S.E. once stood. Trosky was thirteen months behind in his contract payments. Yet annual reports to the court, filed by the trustee through its attorney from 1990 to 1995, indicated no change in trust assets. During this same time period, trustee's fees increased from $300 charged by City National Bank to $1700 charged by Hawkeye Bank.

Mercantile forfeited the trust's contract with Trosky in November 1995 and advised Haberstick that the trust's assets were depleted. It also issued Haberstick her final monthly payment of $1000. The bank sold the remaining house and lot for $35,000. After paying off outstanding liens and expenses, the bank issued a lump sum payment to Haberstick of $5000 in March 1996.

**B. _Legal proceedings._** Haberstick, along with the five remaining Hamilton heirs, sued Mercantile Bank—as successor trustee to Hawkeye State Bank—for negligence, breach of fiduciary duty and waste in the administration of the Julie McDaniel Hamilton Trust. The plaintiffs sought both compensatory and punitive damages. The bank moved for summary judgment with respect to claims made by the children. It urged that the children—as contingent remaindermen—had no standing to sue the trustee for damages. The court sustained the motion and the case proceeded to jury trial on Haberstick's claims.

At trial, plaintiff tendered expert testimony concerning the valuation of the properties in question and the duties of a corporate fiduciary to protect and preserve trust assets. Following the close of all the evidence, the court granted Mercantile's motion for directed verdict on the negligence and waste claims, concluding any damages recovered on those theories would duplicate those recoverable for breach of fiduciary duty. Thereafter the jury returned a verdict awarding Haberstick $276,000 in compensatory damages and $750,000 in punitive damages.

The court overruled the bank's post-trial motions for new trial, judgment notwithstanding the verdict, and remittitur. It also entered an order apportioning the punitive damages award twenty-five percent to Haberstick, thirty-three percent to plaintiff's counsel for fees, and the remainder to the Iowa Civil Reparations Trust Fund. _See_ Iowa Code § 668A.1(2)(b) (1999). These appeals by Mercantile Bank

and the contingent remaindermen followed.

Further facts will be detailed as they pertain to the issues on appeal. Our appellate review of this action, tried at law, is on assigned errors only. *Claus v. Whyle*, 526 N.W.2d 519, 523 (Iowa 1994).

## II. Issues on Appeal.

■ *A. Compensatory damages.* Mercantile concedes at the outset that it breached its fiduciary duty to Haberstick. But it contends the record supports no more than $112,000 in actual damages. Its argument rests on the premise that Haberstick's loss must be limited, as a matter of law, to the amount she would have received from the trust after March 1996 had Trosky fulfilled his obligations under the real estate contract. The district court rejected this argument in its ruling on the bank's motion for judgment notwithstanding the verdict and, we think, rightly so.

■ We consider the bank's argument in light of the general and well-settled rule that a trustee has the duty to protect trust property against loss or destruction, taking such action as a reasonably prudent person would take to protect his or her own property. George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 582, at 346 (rev.2d ed.1995) [hereinafter *Bogert on Trusts*]. The rule is embodied in Iowa's probate code, which imposes liability on every fiduciary who, by negligent or willful act, causes loss in the administration of an estate. Iowa Code § 633.160. Although a successor trustee is not automatically liable for a breach of trust committed by a predecessor trustee, liability will be imposed where the successor knows or should know of the breach and nevertheless permits its continuation. Restatement (Second) of Trusts § 223, at 518–19 (1957). The measure of damages for such breach of trust is the difference between the value of the beneficiary's rights to principal and

income before and after the breach. *See generally Bogert on Trusts* § 862, at 48.

Here, the trust under Hamilton's will imposed upon the trustee—and its successors—an obligation to pay Haberstick, monthly, all of the income from the trust or $1000, whichever sum was greater. To support its argument for limited damages, Mercantile relies heavily on the fact that its predecessor's contract with Trosky, negotiated in 1991, called for payments of only $1115 per month. But Orville Bloethe, a probate expert called by the plaintiff, testified that a trustee's duty with respect to a real estate contract extends beyond merely collecting monthly payments. He opined that the trustee had a duty to preserve and maintain, if necessary, the underlying security so that the income stream would continue. Bloethe's observation is important because the record also reveals that the property's income potential exceeded $4000 per month during the extended time that Trosky was in default. An experienced real estate investment advisor, Darwin Garman, testified that rental properties of this kind were in substantial demand during this timeframe. He appraised the properties using 1994 market values, ranging them in total value from a high of $204,000 to a low of $134,000.

Given this record, the jury could accept the bank's argument that if Trosky had fulfilled his part of the bargain the contract would never have generated more than $1000 per month. But the jury was not required, as a matter of law, to accept that premise. It could have concluded, based on the expert testimony, that the trustee's failure to commence forfeiture on Trosky's default meant that it lost the opportunity to recover the properties at a time when they might have generated substantially more income for the trust beneficiary. We thus reject, as did the district court, the bank's contention that the contract limited the recoverable damages for breach as a matter of law.

■ That brings us to the amount of damages awarded, a matter peculiarly within the province of the jury. *Kautman v. Mar–Mac Cmty. Sch. Dist.*, 255 N.W.2d 146, 147 (Iowa 1977). Haberstick argued at trial for damages totaling $320,000. She based this claim on Garman's testimony that the fair market value of the properties, if maintained in average condition, should have generated a minimum return of twelve percent, or roughly $24,000 per year. This is what she should have earned, she argued, for her lifetime from and after Trosky's breach in 1991, less the $1000 per month she received until November 1995. The bank, admitting that Haberstick lost thirty-four months of payments from November 1995 through trial in February 1999, and admitting she was entitled to an additional $1000 per month for the remainder of her life expectancy of 6.5 years, urged the jury to return a verdict of only $112,000. The jury returned an award of $276,000. This sum is plainly within the range of evidence presented at trial, and the district court committed no legal error in refusing to set it aside. *Id.*

■ **B. Punitive damages.** Mercantile next challenges the district court's denial of its motions for new trial and judgment notwithstanding the verdict on the issue of punitive damages. Mercantile argued at trial, and now urges on appeal, that the record contains insufficient evidentiary support for an award of punitive damages. It claims, in the alternative, that the award was excessive on its face or resulted from the admission of evidence that should have been excluded. The district court rejected these contentions, and so do we.

■ The question is whether "by a preponderance of *clear, convincing, and satisfactory* evidence, the conduct of the defendant from which the claim arose constituted *willful and wanton* disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a) (emphasis added). As Mercantile rightly notes, merely negligent conduct will not, without more, support an

award of punitive damages. *Beeman v. Manville Corp. Asbestos Disease Comp. Fund*, 496 N.W.2d 247, 256 (Iowa 1993). To sustain a punitive damages award here, Haberstick was required to prove that the bank engaged in a persistent course of conduct demonstrating that it acted with "no care" and without regard to the consequences of its inaction. *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 156 (Iowa 1993). The purpose of imposing punitive damages in such a case is to punish the willful and wanton conduct and deter the defendant, and others, from repeating such conduct in the future. *Ezzone v. Riccardi*, 525 N.W.2d 388, 398 (Iowa 1994); *accord McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000).

In *Ezzone*, this court held that any award of punitive damages must be tested by examining (1) the extent and nature of the outrageous conduct, (2) the amount necessary to deter such conduct in the future, (3) the relative size of the punitive damages award as compared to actual damages and, (4) surrounding circumstances bearing on the relationship of the parties. *Ezzone*, 525 N.W.2d at 399. Applying those factors here, we are satisfied the record supports submission of the issue and the jury's verdict. The relationship between the parties was fiduciary in nature, implicating the highest levels of trust and reliance. The breaches of trust were not isolated but repeated, extending over a period of years. They touched every aspect of the trustee's most basic duty to protect and preserve the trust property—to collect revenue, to pay taxes, to insure against loss, and to preserve value through routine maintenance and repair. *See generally* George T. Bogert, *Trusts* § 99, at 358–59 (6th ed.1987). Absolutely no effort was made by Mercantile to ascertain the condition of these properties or the status of the Trosky contract when it assumed its role as successor trustee to Hawkeye Bank, just as Hawk-

eye had abrogated its duty to do so when it took over the trust from City National.

The complete and utter failure of the bank to offer an explanation for its inaction bespeaks an ulterior motive. One can only assume from this record that more remunerative trusts occupied the trust officers' time. The willfulness of the bank's conduct is plainly demonstrated by its failure to advise the trust beneficiary or the court of material changes in the trust property, concealment that occurred while annual fees for trust services increased six-fold.

■ Moreover we agree with the district court that the size of the punitive damages award is not out of proportion to the actual damages sustained. Evidence in the record revealed that Mercantile is part of a twenty-one-bank holding company. Mercantile, standing alone, claims assets in excess of $48 million. Clearly a substantial "sting" would be required to deter this financial institution from profiting in the future by ignoring—and thereby impairing—the rights of trust beneficiaries such as Virginia Haberstick.

■ Finally, we reject Mercantile's claim that an alleged evidentiary error by the court contributed to the size of the award, compelling a new trial. The controversy arose when testimony adduced by the plaintiff suggested that the bank, uncaringly, denied mismanagement of the trust and, when confronted, challenged Haberstick to get a lawyer. Mercantile sought to dispel this inference by attempting to introduce two letters of settlement, authored by a bank trust officer, which suggested that any recommendation regarding lawyers rested on the bank's concern that Haberstick and the remaindermen might have differing legal interests, requiring separate counsel.

■ The bank correctly asserts that offers of settlement, excludable under Iowa Rule of Evidence 408, may be admitted if offered for another purpose. *Hyler v. Garner*, 548 N.W.2d 864, 869 (Iowa

1996). It has, however, failed to show the court abused its discretion in refusing the tendered evidence here. *See Gail v. Clark*, 410 N.W.2d 662, 671 (Iowa 1987) (decision whether to admit proof of settlement offer on alternate ground "committed to the discretion of the trial court"). The court reasonably concluded that the purpose for admitting the letters—to rebut a misimpression—could be accomplished more easily and accurately by permitting additional testimony by the trust officer. The remedy the bank proposed would require nearly three-fourths of the letters' text to be redacted. It was not entitled to that alternative as a matter of law. *See id.* at 672. No ground for reversal appears.

## III. Summary Judgment.

The contingent remaindermen have mounted a separate appeal to challenge the district court's summary dismissal of their action for waste. Mercantile assails the appeal as untimely as well as unmeritorious. Thus before turning to the merits of the remaindermen's claim, we briefly address the appeal's procedural posture.

*A. Timeliness.* As explained earlier in this opinion, Julie McDaniel Hamilton's children—as contingent remaindermen under her testamentary trust—joined Haberstick as plaintiffs in suing Mercantile for negligence, breach of fiduciary duty, and waste. Prior to trial, Mercantile moved to summarily dismiss the remaindermen from the suit on the ground they had no standing, as a matter of law, to proceed. The district court granted Mercantile's motion and the case proceeded with Haberstick as the only plaintiff.

Four months later, just prior to trial, the contingent remaindermen asked the court to reconsider its summary judgment ruling. The court declined. Thereafter the case proceeded to trial, with the jury returning a verdict in Haberstick's favor on her breach of fiduciary duty claim. The contingent remaindermen then filed their notice of appeal.

Mercantile now claims the remaindermen's notice of appeal was *too early* because, when it was filed, the court had not yet ruled on the bank's post-trial motions. Relying on *Recker v. Gustafson*, 271 N.W.2d 738, 739 (Iowa 1978), it claims this court has no jurisdiction to proceed and must dismiss the appeal as premature. In the alternative, Mercantile claims the appeal comes *too late*. It reasons the case was final as to the remaindermen months earlier when the court issued its summary judgment ruling.

Although neither party cites authority precisely on point to resolve this quandary, we think the spirit of Iowa Rule of Appellate Procedure 5(b) permits the appeal to go forward. The rule states:

> Notwithstanding these rules, an order disposing of an action as to fewer than all of the parties to the suit, even if their interests are severable, or finally disposing of fewer than all the issues in the suit, even if the issues are severable, may be appealed within the time for an appeal from the order, judgment, or decree finally disposing of the action as to remaining parties or issues.

Iowa R.App.P. 5(b). We recognize that, even under this rule, the judgment was not final as to Haberstick and Mercantile until the court issued its post-trial rulings. But, unlike the situation presented in *Recker*, none of Mercantile's post-trial motions had any bearing on the contingent remaindermen's substantive claim. Under these circumstances, we are not inclined to penalize the remaindermen for arguably "jumping the gun." It appears their appeal would have been interlocutory, and hence unappealable, pending the conclusion of trial as to the remaining parties. *See Stockburger v. Robinson*, 270 N.W.2d 453, 454 (Iowa 1978) (resolution of claims which are "dependent upon or intertwined with" claims asserted by other plaintiffs or defendants are not final, for purposes of appeal, until final resolution of the case) (quoting *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299, 303 (Iowa 1975)). Rather than dismiss, we elect to proceed to the merits of their claim. *See* Iowa R.App.P. 1(d) (im-provident appeal taken from interlocutory order not alone ground for dismissal).

**B.** ***Standing.*** The controversy over the remaindermen's standing to bring an action at law for waste turns on the district court's reliance on *Carstens v. Central National Bank & Trust Co.*, 461 N.W.2d 331 (Iowa 1990). In *Carstens* this court held that "a contingent remainderman cannot maintain an action at law against the trustee because the trustee has no present obligation to pay or turn over assets." *Carstens*, 461 N.W.2d at 334. The remaindermen claim *Carstens'* holding cannot be reconciled with a more recent court of appeals case, *Bennett v. Johnson*, 485 N.W.2d 481 (Iowa App.1992). In *Bennett*, the court held a remainderman must bring an action for waste within the five-year limitation period for damage to property. *Bennett*, 485 N.W.2d at 483. So while the remaindermen argue the district court's decision creates for them a statute of limitations problem, the bank maintains the remaindermen have no cause of action in the first place.

Mercantile has the better argument. A claim for waste is an action at law brought by a remainderman against a tenant in lawful possession of land—usually a life tenant or tenant for a term of years—who is allegedly using the land in such a way as to diminish its value. *See* 78 Am.Jur.2d *Waste* § 10, at 401–02 (1975); *see also* Black's Law Dictionary 1098 (abr. 6th ed.1991) (defining waste as "action or inaction by a possessor of land causing unreasonable injury to the holders of other estates in the same land"). In Iowa, statutory relief from waste is codified at Iowa Code section 658.1. The section provides:

> If a guardian, tenant for life or years, joint tenant, or tenant in common of real property commit waste thereon, that person is liable to pay three times the damages which have resulted from such waste, to the person who is entitled to sue therefore.

Iowa Code § 658.1. As this statute and the common law definitions illustrate, waste is a concept related to real estate.

Here, there is no life tenant against whom a statutory action for waste may attach. Although the remaindermen insist a trustee whose duty it is to preserve and protect trust assets is equivalent to a life tenant, they cite no authority for this proposition. Indeed it appears the authority is to the contrary. No trust is created when property is transferred to an individual for life with remainder to another because the life tenant takes title outright, the only restriction being the duration of the estate. Restatement (Second) of Trusts § 16C, at 54. In a trust, by comparison, legal and equitable ownership of the land are severed. The trustee's action is restricted by an overarching fiduciary duty. *See* 76 Am.Jur.2d *Trusts* § 1, at 28 (1992). But for actions to redress an immediate and unconditional entitlement to money or chattels, a beneficiary's remedies against a trustee are exclusively equitable. *Carstens,* 461 N.W.2d at 333–34 (citing Restatement (Second) of Trusts § 199, at 437 (1959)).

The plaintiffs in *Bennett* owned a remainder interest in a tract of farmland held outright by the life tenant, with no trust involved. *Bennett,* 485 N.W.2d at 482. Those facts, as well as the applicable law pertinent to estates in remainder or reversion, are plainly distinguishable from the case before us. *See* Iowa Code § 658.5 (authorizing owner of estate in remainder or reversion to bring action for waste notwithstanding intervening estate for life or years). The district court correctly applied *Carstens'* controlling authority here. Summary judgment for Mercantile on the remaindermen's claim must, accordingly, be affirmed.

**AFFIRMED ON BOTH APPEALS.**

All justices concur except CARTER, J., who takes no part.